UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:09CR 177 SNLJ |
| | ) | |
| TRAVIS DALE WEILER, | ) | |
| | ) | |
| Defendant(s). | ) | |

**REPORT AND RECOMMENDATION**

In his Motion to Suppress Evidence and Statements and Memorandum, the defendant requests that the court suppress all physical evidence, tangible or intangible, and any other tangible or intangible evidence directly or indirectly derived from the search of the double wide trailer with outbuildings and one detached garage at the Pamela Merriman residence on November 20, 2009.

The crux of the defendant's argument is that the Affidavit in support of the Search Warrant is invalid in that it failed to make a proper showing of probable cause pursuant to the Fourth Amendment. The memorandum continues further that law enforcement lacked legal justification for even entering upon the Merriman residence to execute the warrant as all the alleged "facts" in the affidavit were learned while law enforcement was illegally encroaching on the Merriman property and, as such, those facts cannot form the basis for finding probable cause.

The court compliments the parties on their extensive and thorough memoranda which were of significant help to the court.

## Factual Background

On Friday, November 20, 2009, at approximately 2:00 A.M., Perry County Sheriff's Deputy Richard Couch was traveling north in the 6700 block of North Highway 61, near St. Mary, in Perry County, Missouri. Couch noticed a strong odor of ether in the air. The odor was strong enough that he could perceive it from the road with the car windows up. Prior to November 20, 2009, Couch had considerable experience in dealing with illegal methamphetamine laboratories, having attended a two-week school conducted by the DEA, had other training and dismantled approximately 200 clandestine meth labs during six years as an agent for the Southeast Missouri Drug Task Force.

Couch testified that his training included identifying the various chemicals and other items that are used to manufacture methamphetamine. Couch also indicated that ether has a very distinct odor that he had encountered at methamphetamine labs in the past. Ether is used in making methamphetamine and is commonly obtained from opening cans of starting fluid. Couch was also aware that ether is flammable, explosive and toxic to humans, and had investigated several meth labs where there had been an explosion. Couch also recognized that while ether has legitimate uses in small amounts, the strong persistent odor of ether is consistent with it being used for illegal purposes.

Couch called Perry County Deputy Bob Brown and asked if he could respond to the area and determine if he could also smell the ether and perhaps determine where it was originating from. Approximately 30 minutes later, Couch had completed his detail and met with Deputy Brown north of the defendant's residence, which is where Brown had determined that the odor was the strongest. Deputy Brown had also learned that there was a "Paula Merriman" associated with that residence and that Ms. Merriman had a criminal history of manufacturing a controlled substance.

Deputies Couch and Brown then walked about 150 feet up the driveway toward the house

where the odor of ether was still obvious. Couch described it as being "much stronger" and indicated that "It was quite evident that it was coming from that location." Couch testified that there were no gates or fences that would prohibit someone from walking up the driveway to the house, and that he did not observe any "No Trespassing" signs. Once near the house, Couch observed a light on in the garage and looked in a window which was set in the door. Couch testified that he did so in order to see if anyone was inside because of the strong ether odor emanating from the building. In Couch's experience if people are manufacturing methamphetamine there is potential danger "not only from toxins, chemicals, but also from violence from methamphetamine cookers or users." Couch testified that he was concerned not only for the safety of himself and Deputy Brown, but also for the safety of anyone who might have been in the building.

The deputies were able to look into the garage through the window in the door without having to open the door or manipulate the window. Couch was able to see a plastic gas container with a hose coming out if it that he recognized as an item which is commonly used as an acid generator for processing methamphetamine.

Deputy Brown went to the back of the garage to see if there was another door "in case there was someone inside the garage." While at the back of the building, Brown found an open window. The deputies had an unobstructed view of the interior of the building from that window. Couch observed additional items that he recognized as being associated with the manufacture of methamphetamine; an upside down propane tank and lithium battery pieces. Couch was able to see these items unaided and without having to manipulate the window in any way.

Couch then contacted Deputy Carl Manche whose job it was to investigate methamphetamine labs. The deputies decided to wait for additional help because they were trying to determine if there

was enough evidence to obtain a search warrant. Although the deputies were able to see that there was someone moving about in the house, they knew that there was no one in the garage and felt that there was no danger as long as no one came back into the garage.

Deputy Carl Manche testified that he has attended a forty-hour clandestine drug lab course taught by the Highway Patrol, as well as additional meth lab training with other agencies. Manche likewise had been trained to recognize the various chemicals and other items used in the manufacture of methamphetamine. Manche had investigated over a dozen meth labs and assisted other officers in such investigations on ten to twenty occasions. Manche approached the residence by way of an open field that bordered the north of the property, and noticed a chemical odor that he associated with manufacturing methamphetamine or "an unusual amount of ether being released into the air by some way." Manche believed that given the vapor in the air that there was danger of a fire or explosion. Manche asked Couch if there was anyone in the building because he was concerned for safety reasons.

Standing at the window at the rear of the garage, Manche was able to see inside without manipulating anything. Manche observed a box fan blowing toward a wooden spool on the floor and a can of household lye sitting on top of the fan. Manche also observed a couple of glass jars containing a clear liquid, the plastic gas container with the hose coming out of it, lithium battery pieces, an empty battery package, various tools, and three or four cans of starting fluid. Manche also noted the upside down propane tank, which he thought was unusual as well. Manche testified that while there are legitimate uses for all these products, there is no legitimate reason to take lithium batteries apart or vent large amounts of ether into the air. Manche recognized that taking lithium batteries apart or venting large amounts of ether was both hazardous and was associated with

manufacturing methamphetamine.

Manche reviewed chemical logs maintained by area businesses and determined that on November 3rd, 4th and 6th, Pamela Merriman had purchased pseudoephedrine pills which are used in the manufacturing of methamphetamine. Travis Weiler had purchased pseudoephedrine pills on November 2nd, 4th and 14th. Both Merriman and Weiler had purchased lye on one of the same days that they purchased pseudoephedrine pills, but Merriman had provided a false name to the store. Manche and Corporal Kelly drafted an application and affidavit for a search warrant which was presented to state Judge William Syler who found probable cause and issued the search warrant for the residence.

A search of the premises located numerous items in the garage and trailer house associated with the use and manufacture of methamphetamine. Travis Weiler was not present at the residence; however, officers interviewed some of the other persons present: James Cochran, Gerald Burroughs, Pamela Merriman and Jeremy Merriman, all of whom made statements pointing to Weiler as a participant in their activities.

Weiler was arrested pursuant to a warrant on December 17, 2009, and was transported to the Perry County Sheriff's Department. Manche and Captain Delbert Riehn attempted to interview Weiler in Captain Riehn's office. Weiler was shackled , but the deputies could not remember if he was handcuffed or not. Both Deputy Manche and Captain Riehn testified that Weiler was an adult person, did not appear to be injured, did not appear to be intoxicated or otherwise impaired, did not appear confused and did not seem to have difficulty in understanding the officers or in making himself understood.

Manche read Weiler the warnings from a standard <u>Miranda</u> waiver form used by the Sheriff's

Department. Weiler indicated that he understood those rights. When Manche read the statement from the waiver form that says, "Having these rights in mind, do you wish to talk to us now?" Weiler circled "No" on the form and said, "Not without my attorney present." Neither deputy asked any more questions at that time. Manche told Weiler that they were "done" and Reihn called the jail staff and requested that they take Weiler back to the jail area.

Weiler was then told what he was being charged with and that there was also a federal indictment for him. Both officers testified that the information given Weiler was typical of what they would inform any prisoner in that situation and it was not done in an attempt to get Weiler to change his mind about speaking with them without an attorney. (Tr., pp. 47-48, 88-89). Nothing else was said to Weiler at this time.

As Weiler started to walk out with the jailer, he paused for a moment and asked the deputies, "Can I change my mind? I want to talk to you guys now.' At that point, Weiler was re-Mirandized. Manche testified that he specifically inquired about Weiler's change of heart:

> SAUSA: "...did you say anything to get him to change his mind about talking to you without a lawyer present?"
>
> Manche: "No, I did not. I even asked him if - - I explained to him now you understand you're not being coerced, we're not threatening you, we're not making any promises to you, you're doing this of your own free will. And he said, "Yeah."

(Tr., p. 48).

Manche read the rights form again word for word and Weiler indicated that he understood his rights and initialed the form after each line and signed the bottom. Weiler then reiterated that he wanted to speak with the deputies without an attorney being present. Both deputies testified that Weiler did not ask for a lawyer again, that no one displayed a weapon, laid hands on him or roughed

him up, no one forced or threatened him or made him any promises to get him to change his mind about speaking without a lawyer. (Tr., pp. 52, 93).

### **Discussion**

Before examining the question of probable cause for the issuance of the search warrant, the court will look at the defendant's claim that the facts alleged in the affidavit were obtained illegally by law enforcement "encroaching on the Merriman property."

Entering on the Merriman Property

The factual background relates that on November 20, 2009, at approximately 2:00 A.M., Perry County Sheriff's Deputies Richard Couch and Bob Brown detected a strong odor of ether which they determined was associated with a trailer with outbuildings at 6755 North Highway 61 in St. Mary, Missouri. Both officers had significant training in dealing with illegal methamphetamine laboratories and both knew that ether is used in making methamphetamine. It has a distinctive odor. Deputy Brown had learned that Paula Merriman, who resided in the mobile home, had a criminal history of manufacturing a controlled substance. The officers had parked their cars and they walked about 150 feet up the driveway toward the house which they believed was the source of the ether odor. Deputy Couch testified that as they came closer to the trailer, the odor became much stronger. Once near the house, Deputy Couch observed a light on in the garage and looked in a window which was set in the door. He testified that he did so in order to see if anyone was inside because of the strong ether odor emanating from the building. He testified that if people are manufacturing methamphetamine, there is potential danger "not only from toxins, chemicals, also from violence from methamphetamine cookers or users." Couch testified he was concerned for the safety of himself and

Deputy Brown, but also of anyone who might have been in the building. (Tr., p. 10). Couch saw a plastic gas container with a hose coming out of it which he recognized as an item which is commonly used as an acid generator for processing methamphetamine. Deputy Brown went to the back of the garage to see if there was another door "in case there was someone inside the garage." He saw an open window. He saw further items used in the manufacture of methamphetamine: an upside down propane tank and lithium battery pieces.

Couch contacted Deputy Carl Manche, whose job it was to investigate methamphetamine labs. Deputy Manche approached the residence by way of an open field that bordered the north of the property and noticed a chemical odor that he associated with manufacturing methamphetamine or "an unusual amount of ether being released into the air by some way." Manche believed that given the vapor in the air, there was danger of a fire or explosion. He was concerned for safety reasons if there was anyone in the building. Standing at the window at the rear of the garage, Manche was able to see inside without manipulating anything. He observed a box fan blowing toward a wooden spool on the floor and a can of household lye sitting on top of the fan. He saw a couple of glass jars containing a clear liquid, the plastic gas container with a hose coming out of it, lithium battery pieces, an empty battery package, various tools and three or four cans of starting fluid. Manche testified there is no legitimate reason to take lithium batteries apart or vent large amounts of ether into the air. (Tr., pp. 37-38). He recognized that taking lithium batteries apart or venting large amounts of ether was both hazardous and was associated with manufacturing methamphetamine.

"Open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance." United States v. Ford, 34 F.3d 992, 996 (11th Cir. 1994). "Fourth Amendment protection only extends to the home

and the enclosed area immediately surrounding the house (its 'curtilage')." Oliver v. United States, 466 U.S. 170 (1984).

With regard to the question of the legitimacy of the officers' gathering information which went into the affidavit supporting the application for the search warrant, the government points to the fact that a "knock and talk" investigation does not normally violate the Constitution and no Fourth Amendment search occurs where officers who enter private property restrict their movements to areas generally made accessible to visitors such as driveways, walkways and similar passage ways. United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008); United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2005); see also United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984).

The government also points to the Weston case for the proposition that "where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment provided that the intrusion upon one's privacy is limited." 443 F.3d at 667. The Weston case also cited United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001).

Deputies Couch and Brown were pursuing a legitimate law enforcement objective, investigating the source of a strong ether odor, an indication of the manufacture of methamphetamine, especially in view of the previous involvement of Ms. Merriman in the manufacture of methamphetamine. In addition, Couch was aware of the potential danger of manufacturing methamphetamine, "of toxins, chemicals." (Tr., p. 10). Couch testified he was concerned not only for the safety of himself and Deputy Brown, but also anyone who might have been in the building. Id. When Manche arrived, he believed given the amount of vapor in the air, there was danger of a fire or explosion. (Tr., p. 33). He was also concerned for the safety of anyone who might be in the building. (Tr., pp. 33-34).

Since Manche approached from open fields before entering the curtilage, the Fourth Amendment was not violated by his approach. Ford, 34 F.3d at 996; Oliver, 466 U.S. 170.

Once it became evident to the officers that there was danger because of the ether vapor to themselves or any member of the public (including methamphetamine cooks), exigent circumstances may justify further action. In United States v. Moskow, 588 F.2d 882, 892 (3d Cir. 1978), entry was justified because police knew a suspected arsonist had been in the building and delay would have created a risk of harm to officers and general public; in United States v. Newman, 472 F.3d 233, 238 (5th Cir. 2006), entry was justified because officers reasonably feared for their safety when they knew a drug dealer frequented a house, an individual fled as officers approached, officers observed closed circuit surveillance system and movement within the house; in United States v. Atchley, 474 F.3d 840, 851 (6th Cir. 2007), entry was justified because officers reasonably believed that occupants were manufacturing methamphetamine in a hotel room and such operations present danger of explosion, which could harm people nearby; in United States v. Uscanga-Ramirez, 475 F.3d 1024, 1029 (8th Cir. 2007), entry into a home was justified because witnesses informed officers that defendant locked himself in a bedroom with gun and was upset over disintegrating marriage; in United States v. Lloyd, 396 F.3d 948, 954 (8th Cir. 2005), entry was justified because police smelled ether and felt there was risk of fire or explosion; in United States v. Francis, 327 F.3d 729, 735-36 (8th Cir. 2003), exigent circumstances existed despite the fact that fire was extinguished because the cause of the fire, chemicals used to manufacture methamphetamine, continued to present danger.

Although entry into the garage and home might have been justified by exigent circumstances, the officers did not enter either building but instead sought a search warrant.

The information gathered by Deputies Couch, Brown and Manche was properly obtained and

could be used in the affidavit presented to Judge Syler by Deputy Manche.

## Probable Cause

The United States Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in Gates more fully, Id.:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Court offered the following caution to reviewing courts, Id. at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." Spinelli, supra, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," Ventresca, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." Id., at 109, 85 S.Ct., at 746.

Probable cause is

a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types

of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court found, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v. United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

As the Supreme Court stated in Gates, our review of the sufficiency of the affidavits should not take the form of a de novo review.

In reviewing the affidavit, the court finds that the affidavit does state probable cause that evidence of a crime, namely, methamphetamine and ingredients and devices for the manufacture and/or consumption of methamphetamine and related paraphernalia would be found in the residence of Pamela Merriman with three outbuildings and one detached garage.

The affidavit recites that Deputy Manche had received 480 hours of law enforcement training at the Southeast Missouri Law Enforcement Academy in Clandestine Lab Training and attended numerous seminars concerning the enforcement of drug laws from the Missouri State Highway Patrol, dealing with the visual identification of drugs, including marijuana, marijuana seed, marijuana stems, methamphetamine, methamphetamine precursors and drug paraphernalia.

The affidavit continued, describing how Deputy Richard Couch came into contact with a very strong odor of ether on the night of November 20, 2009. Deputy Couch located the smell of ether

coming from the Merriman residence. Deputies Brown and Couch approached the residence and noticed the odor of ether was stronger at the garage. Deputy Couch looked in the garage and observed a red gas can with a hose attached which is indicative of a gas generator that produces hydrochloric gas which is used in the manufacture of methamphetamine. Deputy Couch observed a Mason jar containing a clear unknown liquid on the floor and on a shelf there was another Mason jar with a clear unknown liquid. The affidavit continued that Mason jars and clear chemicals are indicative and are used in the manufacturing of methamphetamine. Also, a can of starting fluid was located on the shelf in the garage. This is a chemical used in the manufacture of methamphetamine. Deputy Couch observed all the above items by looking through the window of the garage and without ever entering the garage.

When Deputy Manche arrived, he states in the affidavit that he immediately detected an extremely strong odor of ether emitting from the garage. He observed a container of lye with a lid removed which contains sodium hydroxide which is used in the manufacture of methamphetamine. He continues that Deputies Couch and Brown observed subjects moving inside the residence. From his training and experience, Manche stated that subjects who are manufacturing methamphetamine, do it late at night or in the early morning hours to avoid detection.

Deputy Manche stated that Pamela Merriman resides at the above address with her husband. It continued that Pamela has a son named Travis Weiler and it was unknown whether Travis resided at the address or not.

The affidavit continues that Travis was convicted of manufacturing a controlled substance in St. Francois County, Missouri. It continues that Travis has two felony convictions of Possession of a Controlled Substance in the 42nd Circuit Court of Missouri. Pamela Merriman was convicted of

Manufacturing a Controlled Substance in the 21st Circuit Court of the State of Missouri.

The affidavit continues that Manche reviewed chemical logs from Walgreens, different Wal-Marts in various cities in Missouri and listed the many boxes of pseudoephedrine Pamela Merriman purchased, as well as a bottle of lye from True Value located in Perryville, Missouri. Pamela used a false name, Renèe Humner, with an address different from her true address. An employee at the True Value store identified a photograph of Pamela Merriman as the person who bought the lye using the alias of Renèe Humner.

The affidavit continues that Travis Weiler bought boxes of pseudoephedrine from various locations in Perryville, Missouri, as well as a bottle of lye from True Value in Perryville.

The court finds that the affidavit provided probable cause for Judge Syler to reach the conclusion that there was "a fair probability that contraband or evidence of a crime" would be found in the Merriman residence including outbuildings and garage.

The defendant urges in his motion and memorandum that because the search warrant was issued based upon observations of law enforcement officers "that followed the illegal encroachment and search and seizure on November 20, 2009, all statements and/or admissions made by Travis Weiler must be suppressed as 'fruit of the illegal encroachment.'"

The court has found that the officers' entry upon the Merriman property was justified, that the search warrant was properly issued and, as a result, statements made by the defendant were not the fruit of an illegal encroachment.

The motion of Travis D. Weiler to suppress evidence and statements (Document #81) should be denied.

<u>Second Motion to Suppress</u>

Defendant has filed a Second Motion to Suppress Evidence and Statements (Document #99).

In his second motion, defendant alleges that while defendant was at Perry County Jail on December 17, 2010, certain sheriff's deputies indicated to defendant that they "wanted to talk with him" and defendant stated that "he wanted to talk to a lawyer."

Defendant alleges further that after defendant invoked his right to counsel, the deputies again initiated questioning of defendant shortly after he invoked his right to counsel. Defendant continues that as a result, defendant made certain statements taken in violation of his rights under the Fifth Amendment. Defendant states that defendant made later statements after December 17, 2010, that should be suppressed as "fruit" of the December 17 interrogation.

In his Supplemental Memorandum, defendant argues that after defendant invoked his right to counsel, "law enforcement almost immediately notified defendant he was 'federally indicted.'" Defendant believes telling the defendant he was federally indicted "was a clear threat to defendant in that by invoking his right to remain silent, defendant's legal problems would only dramatically increase." Defendant states that he understood the implicit threat and immediately began talking with law enforcement.

At the evidentiary hearing, Deputy Manche testified that on December 17, 2009, defendant was in custody at the Perry County Jail. Deputy Manche read the Miranda rights to the defendant from a form used at the Perry County Sheriff's Department. After the rights were read, Mr. Weiler indicated he understood his rights. (Tr.,p. 46). After being asked as listed on the form, "Having these rights in mind, do you wish to talk to us now?" Weiler circled "No" on the form and verbally stated, "Not without my attorney present." (Tr., p. 47). When questioned if the deputies asked Mr. Weiler any more questions, Manche testified, "No, no. We told him we were done." Id. Then

- 15 -

Captain Riehn contacted the jail division and said, "We're done. Could you come up and get Mr. Weiler." Manche testified, "Then we explained to Mr. Weiler that a federal indictment would be coming down for him as soon as we received the fax and he would be transported probably to Cape Girardeau soon on that indictment." Id. Manche testified that was typical of what they would tell any prisoner. Id.

Deputy Manche described what happened then:

> Q. Okay. Now, did you say anything else to Mr. Weiler at that point in time?
>
> A. No, sir. He started to walk towards – started to walk out the door with the jailer. He – once we explained to him what was going to happen, he paused for a moment and turned around and reapproached us and said he wanted to change his mind. Well, actually, what he said to me was, "Can I change my mind? I want to talk to you guys now." And Captain Riehn and I both told him absolutely. And I told him but he would have to be <u>Mirandized</u> all over again.

(Tr., p. 48).

When asked if he said anything to Mr. Weiler to get him to change his mind about talking to the officers, Deputy Manche said, "No, I did not." Manche told Weiler, "... now you understand you're not being coerced, we're not threatening you, we're not making any promises to you, you're doing this of your own free will." Weiler said, "Yeah." "I don't know anything about this. I want to talk to you guys." Id.

Manche readministered the <u>Miranda</u> warnings using a form introduced at the hearing as Government's Exhibit 3. Weiler initialed next to each of the warnings, circled yes to the questions whether he understood his rights and if he wished to talk to the officers now. He then signed the form and Deputy Manche signed as a witness. Id., (Tr., p. 50), (Government's Exhibit 3).

Mr. Weiler did not subsequently ask to stop the interview; he did not subsequently ask for an

- 16 -

attorney; no one displayed a weapon to Weiler; no one laid hands on him or roughed him up or anything of that nature. No one forced him or threatened him to waive his right to an attorney and to talk to law enforcement officers. Manche testified that no one forced or threatened Weiler or promised him anything to get him to give a statement. (Tr., pp. 51, 52).

A review of the testimony of Deputy Manche both direct and cross-examination and the testimony, both direct and cross, of Captain Riehn, who were the only officers present for the interview of Travis Weiler, yields no evidence to support the defendant's claim that mentioning the fact that Weiler was federally indicted was a threat.

The Eighth Circuit in United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005), did not "find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities." See also, United States v. Valdez, 146 F.3d 547, 551 (8th Cir. 1998).

As the government points out, the defendant had three previous felony convictions and thus was familiar with the procedures of the criminal system. Twice he was fully advised of his rights and stated he understood them. He was able to exercise his will to tell the officers he did not want to talk to them. The court finds that Mr. Weiler was also able to exercise his will without coercion to speak with the officers.

The court finds the defendant voluntarily and with full understanding waived his rights to remain silent and to have his attorney present during his interview. The court finds the defendant's statements were voluntary, are admissible in evidence and should not be suppressed.

**IT IS HEREBY RECOMMENDED** that defendant's Motion and Memorandum of Travis D. Weiler to Suppress Evidence and Statements (Document #81) be denied.

**IT IS FURTHER RECOMMENDED** that defendant's Second Motion to Suppress Evidence and Statements (Document #99) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

*/s/ Lewis M. Blanton*
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of May, 2010.